O37BGRAO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SLG CLOUDBANK HOLDINGS, LLC,
*et al*,

                    Plaintiffs,

            v.                          22 Civ. 2189 (JLR)

GRAB HOLDINGS LIMITED, et al,

                    Defendants.
                                        Oral Argument
------------------------------x

                                        New York, N.Y.
                                        March 7, 2024
                                        12:30 p.m.

Before:

                    HON. JENNIFER L. ROCHON,

                                        District Judge

                         APPEARANCES

CAFFERTY CLOBES MERIWETHER & SPRENGEL
        Attorneys for Plaintiffs
BY:  BRIAN O'CONNELL
        JOSHUA B. SILVERMAN
        RACHEL BERGER


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        Attorneys for Defendants
BY:  SUSAN L. SALTZSTEIN
        JEFFREY S. GEIER



ROPES & GRAY, LLP
        Attorneys for Defendant Gerstner
BY:  DAVID B. HENNES

O37BGRAO

(Case called)

THE DEPUTY CLERK: Counsel, state your appearance.

MR. O'CONNELL: Good afternoon, your Honor. Brian O'Connell for the plaintiff, joined with are Josh Silverman and Rachel Berger.

THE COURT: Good afternoon.

MS. SALTZSTEIN: Good afternoon, your Honor. Susan Saltzstein from Skadden, Arps. With me is Jeff Geier.

MS. HENNES: Good, your Honor. David Hennes from Ropes & Gray on behalf of the alternate defendants.

THE COURT: Thank you. We are here for an oral argument regarding the motion to dismiss. I've let the parties know -- first of all thank you for your patience. I'm in the middle of a jury trial, so I appreciate everyone waiting for a few minutes until we have our lunch break. Now I am ready and eager to hear from you all on the motion. I'll hear from defendant first since it's their motion, and then I'll hear from plaintiffs and then any brief rebuttal that the defendants have. I allocated about 20 minutes per side. There's no need for you to use it all if you don't need it all. I've read the papers. I also have some questions that may interrupt you, so apologies in advance. Why don't we start with defendants.

MS. SALTZSTEIN: Thank you, your Honor. If I may.

THE COURT: Are you going to be arguing only, or are we also going to hear from your colleague?

O37BGRAO

MS. HENNES:  It's my expectation that Ms. Saltzstein will ably cover everything.

MS. SALTZSTEIN:  Susan Saltzstein on behalf of Grab and the Grab individuals defendants, and we can hand up the chart which shows all those folks names.

So, your honor, plaintiffs are bringing these claims under the Securities Act and the Exchange Act related to certain statements in Grab's registration statement and related SEC filings.  And really they do that, the claims in the complaint and particularly in their opposition by plucking out words.  They pluck out phrases, and they'll often edited, and they challenge those in isolation.  But the challenge statements were made as part of a registration statement that's over 400 pages long.  They ought to be evaluated, the statements, as they were written, not as they were edited or clipped or phrases removed.  And I do think that plaintiffs in this case want to avoid a review of Grab's disclosures for a reason.

This is an argument that, if you take a look at what they're ignoring here.  They ignore -- except really in footnote three, the third quarter results in 2021.  And they ignore those because they're not in align with their arguments. Right.  Those third-quarter results showed incentives rising. They use charts that depend on a consistency that's one of their own making.  And if you look at the numbers in the

O37BGRAO

registration statement are not supported.  They apparently dismiss the impact of Covid, even though we're dealing with a ride share app in the midst of Covid.  This case arises in the midst of Covid.  They ignore -- and maybe always ignore, 2019 results, which were reported.  Because again, it doesn't support their narrative.

And they choose metrics that are at best dubious in describing things, which we'll talk about.  They offer no confidential witnesses, none, which is unusual in these cases.  They cite to advertisements that say, we're having a promotion.  And some of those go back to periods where they claim, you know, 2020, for example, which they claim isn't part really of their claims.  They say that we admitted that there were driver shortages when we didn't.  They add words like "may" to our disclosures when it helps them.  And they ignore or misquote our language when it's problematic.  And so in this case, perhaps more than others, the review of the actual disclosures is really important.

The other thing that I wanted to just talk about just as a general overview is the context, because plaintiffs here all claim to have brought the securities of Grab.  And Grab operates its business in eight countries, 400 cities in Southeast Asia including Cambodia, Indonesia, Metmalaysia, Malabar, the Philippines, Singapore, Thailand and Vietnam, and that was in the midst of a pandemic.  They knew what they were

O37BGRAO

buying, and they knew when they were buying.  Throughout the registration statement -- now I also want to say that plaintiffs want to ignore two sort of the context of Covid.  Right.  But thankfully -- and I know we all want to forget Covid, but thankfully Grab did not, and it exhaustively discussed Covid in the registration statement.  There are fulsome descriptions.  There are pages devoted to it, 62, 63, 64.  They were dealing with stay-at-home movements and control orders, social distancing measures, restaurant closures, travel restrictions, and reduced disclose demands for rides. And they were dealing with it realtime, real term.

The case also is important because -- the context is also important because the case centers on Grab's performance during Q4 2021.  That was the quarter in progress at the time of the registration statement.  The registration statement went effective about six weeks before the close of Q4.  And plaintiffs say that the core of their case is that the defendants misrepresented that, one, Grab had sufficient drivers; two, that it had reducing incentive payments; and three that its profits margins were improving and sustainable.  But, your Honor, as we'll hopefully show, none of those hold up against what the actual disclosure said.

I want to talk about their first allegation which relates to driver supply.  And basically the plaintiffs complain that the registration, "stated that drivers were

O37BGRAO

sufficiently available."  That's from their opposition at page one, "and that Grab had sufficient drivers."  It's a prominent theme in their papers, yet you could search the registration statement from its beginning to its end and that is not what Grab said.  Actually what Grab said is, Grab -- and this is just one of the disclosures.  Grab has experienced and expects to continue to experience driver partner supply constraints, or oversupply from time to time in certain areas, including certain areas or locations within the City.  And that's Exhibit A at 68.  That is a very far cry from saying that Grab had sufficient drivers.

The language that Grab used is completely in sync with how the Second Circuit addressed issues like this in the *Asay v. Pinduoduo* case which we cite to.  It's 2021 WL 3871269 at 3.  And the language that the court was looking at there, they have been and may continue to be subject to allegations in a lawsuit.  So the plaintiffs really are creating their own narrative here.  And the disclosures -- and I won't go through it given the time, but we cite to them in our brief, talk about speak with caution, not with confidence.

They also make an argument, your Honor, that the registration statement was supposedly misleading because Grab failed allegedly to disclose it was already suffering from driver shortages.  And they claim using hindsight that Grab admitted to driver shortages in its 20F that was filed on April

O37BGRAO

28, 2021 -- 22, but that's not what it said.  The disclosure said -- and this is at exhibit D at 120, we also saw a decrease in the number of driver partners in the third quarter of 2021 due to similar COVID-19 measures in response to a new waive of COVID-19, and we preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021.  But a decrease does not mean a shortage.  Right.  Indeed cause consumer demands for rides also fell when Covid restrictions were enforced.  That's hardly surprising because people weren't taking rides and drivers weren't driving, so.  It's a balance.  Right.

And Grab disclosed that it continued to be impacted by COVID-19 restrictions that reduce commuter traffic and demand for rides.  And it also disclosed in really the disclosure that they ignore at Exhibit A at 339, that mobility GMV, which is one of the metrics that Grab uses, for three months ended September 30, 2021 was down 30 percent that year, over the prior year, primarily due to increase movement restrictions across the region.  So a decrease is a decrease or a decline which can be helpful or not depending on the circumstances.  And the registration statement explicitly disclosed that Grab has experienced and expects to continue to experience driver partner supply constraints.

THE COURT:  And you're saying that's in exhibit D?

MS. SALTZSTEIN:  That disclosure is in exhibit A at

O37BGRAO

68.

THE COURT:  Thank you.

MS. SALTZSTEIN:  Your Honor, they say shortage.  We say constraints.  And the securities laws, we don't have to adopt plaintiff's pejorative characterization of things. That's just not the way it works.  And that's a typical tactic, but here, that's not what we said.  We said constraints.  The other piece of it, your Honor, is that this sort of decrease in drivers.  As I just said, it all depends whether that's a good thing or a bad thing.  But Grab disclosed the financial metrics.  Right.  And they don't contest that.  They don't contest the accuracy of the historical financial figures.  This included revenue, adjusted EBITDA, GMV, monthly transactions users, partner incentives and consumer incentives.  And it disclose all those metrics from 2019 to the third quarter of 2021, which would have included the consequences of any decrease in the number of drivers. Really nothing more was required.  And it reminded me at least when I read over the Second Circuit's *Vivint Solar* case.  What the court say there, it's not a fair indication of performance.

Grab, as I said, I think I mentioned this point already, but it's important to reiterate, it; disclosed the specific amounts, specific amounts it paid in incentives and how it compared with incentives during the same period in the year before, so really there's nothing omitted.  Plaintiffs

O37BGRAO

also misconstrued the meaning of the word "preemptively" in Grab's disclosure regarding increase investments and incentives in Q4. Indeed as reflected in Grab's March 2022 press release, this is exhibit C at 7. It said it invested in incentives, this is in Q4, to grow driver supply in support of strong recovery in mobility demand. And plaintiff's say, they say, we don't have to pay attention to that. Really it was because of your driver shortage, but they cite nothing to support that, except a few advertisements. If any time Macy's had a sale you had to disclose it, it would be an interesting registration statement. There's also no obligation to disclose business strategies, which is really what they're asking for. Right. They had no obligation to say, hey, we're going to have a sale this week. The SEC -- and I'm quoting from the *Steamfitters* case from the Second Circuit, has never gone so far as to require a company to announce its internal business strategies.

Let me turn to incentives which is another point they focus on. So the plaintiffs argue that the registration statements disclosures were false because "incentives were declining op," which is their opposition of 11." But the registration statement revealed that incentives had increased in the third quarter. And that's something that they just don't grapple with. Not only did it increase, it increased by 42 percent for partner incentives, and a 106 percent for consumer incentives compared to the same quarter in the prior

O37BGRAO

year.

Grab also narratively described it.  So it's not just the numbers, an investor can look at the page and see what the numbers show.  But they also said, Grab said, that it paid significant amounts of incentives to attract new drivers and merchant partners -- I won't read all of this -- and may continue to do so in the future.  These incentives which are typically in the form of additional payments made to partners and consumers have in the past, and may in the future, exceed the amount of the commissions and fees that Grab receives for its services.

Now, this was a business that wasn't making money, and if you look at the disclosures, it says that too.  It's not a profitable enterprise.  People were buying into something looking in the future, but it's absolutely disclosed.  And those statements like that -- I can give you the references; exhibit A at 59, exhibit A at 68, exhibit -- I'm citing here their complaint which is at 78.  They also have what I sort of in my own preparation talked about as the gotcha argument, which is they misquote the registration statement.  Right. They make this argument that as Grab has achieved greater scale -- and I'm quoting them at op at page 10.  It has and may continue to reduce incentives.

What the disclosure actually says, which I think is really important here, exhibit A at 56, as Grab has achieved

O37BGRAO

greater scale, it has and may continue to seek to reduce incentives.  Now the word "seek" is a forward-looking word, and we look describe it as such when we're talking about what words investors should look at as forward-looking.  The other statement cited merely says -- and I mean this is really the crux of their case.  That it's merchant and consumer incentives, and I'm going to put the dots where they didn't, the ellipsis where they didn't ... are expected to continue to decline over time as Grab's business matures.  Over time as Grab's business matures.  So there is not a promise in there that we're going to have declining incentives every quarter.  It's a statement of looking at, you know, we expect and hope to continue to climb as Grab's business matures over time.

THE COURT:  Ms. Saltzstein, let me ask you a question.  With respect to language like, It has and may continue to seek to reduce incentives.  I know you just articulated that you see that as a forward-looking statement, where is your meaningful cautionary language or anything that is going to insulate language like that?

MS. SALTZSTEIN:  Sure, your Honor.  And I will say, your Honor, just to say it, we disclose that its third quarter showed incentives rose.  Plain as day, and I can show you the chart in the registration statement that shows that, and I can give you the reference to it.

So that statement has to be read in the context of the

O37BGRAO

registration statement as a whole, which said third quarter it rose as -- I gave you the percentage before, 42 percent, 106 percent year over year.  That's what the registration statement disclosing in the chart.  And I could -- just give me a second, your Honor.

THE COURT:  That's for what happened in third quarter, right.  So the statements that are being cited to by the plaintiffs as I understand it are things like, Grab may continue to seek to reduce incentives to the extent that Grab experiences driver partner supply constraints in a given market.  Grab may need to increase or may not be able to reduce driver partner incentives that Grab offers, etc.  Why are these not sort of half -- not half truths -- yeah, half truths.

MS. SALTZSTEIN:  Your Honor, because we disclosed that incentives were increasing.  We had our third quarter results which show it.  They're basing it on -- we show in the third quarter that there was a rise in incentives, and we make disclosures all over the place that never promised that those were coming down.  The language that we're talking about here is "may seek to."  There's nothing false about that, your Honor.  That's true.  They were hoping, they were seeking to do it.  The registration statement discloses that in third quarter, which is the last quarter before the registration statement was filed, shows exactly the opposite.  Right.  Shows what they were doing, and they talked about that.

O37BGRAO

THE COURT:  So your argument is that they were seeking to reduce incentives, but they were actually increasing them?

MS. SALTZSTEIN:  Of course.  They're looking to do the best they can.  Right.  They're hopeful.  There are risk factors all over the place.  And, your Honor, I sort of skipped over them in the beginning, but the risk factor said.  Look, we're looking ahead and we hope to, but they disclose literally pages of risk factors and cautionary language that said there's a lot of problems out there.  And we don't know.  And while we're managing through Covid -- this is what the story tells.  While we're managing through Covid, we're going to have to be flexible here, and that's the gist of it, your Honor.  I don't mean to put quotes around that, but that is clearly what they were saying.  That's the overtime language as well.

And the metrics also.  They complain about -- the other thing to mention, your Honor, is that while plaintiffs complain about Q4 incentives, when you actually do the right math, they were 13.38 percent of GMV in the fourth quarter.  Their allegations show that in 2019, that same ratio was 19 percent.  Right.  So it declined over the years.  Right.  It declined over the years.  They just blow pass that.  That's in the registration statement.  No reasonable reader of this registration statement was going to be hoodwinked into believing that.  They showed -- so it's an actually true statement what they said.  They said, if you look at the

O37BGRAO

registration statement, from 2019 to 2021, there was a decline.

THE COURT:  I know you don't have a lot of time left, so let me direct you to a couple of questions I have.  One is, with respect to the contentions that there were misstatements in the Squawk Box interview or the Fortune interview plaintiffs point to cases that cite that statements were made to reassure investors; and therefore, it can't be puffery because they're making statements to reassure the investors and *Washington State Investment Board v. Odebrecht* or *In re Petrobras Securities Litigation*.  Do you have a response to that or their use of those cases?

MS. SALTZSTEIN:  Yeah.  First of all*, Petrobras* was like -- since we were involved in it, I won't say it. Everybody read about that in Brazil which is a big fraud type case.  That is not what we have here.  And, your Honor, puffery, there's nothing in these -- and I went back to look at this, for example, Mr. Tan's appearance on CNBC, what he said was accurate.  And that's the first point.  So they're quoting a December 2, 2021, Squawk box.  And in it they say, Our mobility margins are strong.  We were seeing in our deliveries business break even.  That's what he's saying, and he's right.

So if you look at it, the registration statement disclosed that mobility margins was 12 percent for Q3, and increased from 11.4 percent from the prior year, that's exhibit A at 339.  It was also disclosed that adjusted EBITDA was 64

O37BGRAO

million for the year.  The Q4 results disclosed that full year 2021 mobility margin was 12.4 percent, an improvement from 9.5 percent in 2020.  Yes, it's puffery because these are statements that are immaterial, but they're also accurate.

THE COURT:  Thank you.  All right.  I think we're at 20 minutes.  Did you have anything else you wanted to add?

MS. SALTZSTEIN:  Your Honor, just for the sake -- obviously we'll rely on all the other arguments we made.  I have other points, but for the sake of my co-defendants, I would like to say that the 14A claim which rests completely on the allegations really in a section 11 claim fail.  And that as the JPMorgan case talked about, they should be required to plead that with particularity.  We don't have to debate the pleadings standards here, our argument is under eighth standard.  If you go back to read *Twombly*, there's no way that this particular case passes muster under a plausibility test or any other.

THE COURT:  Thank you.  Let me hear from plaintiffs, please.

MR. O'CONNELL:  Good afternoon, your Honor.  Brian O'Connell on behalf of the plaintiffs.  Defendants made materially misleading statements and omissions in the proxy registration statement to secure Grab's merger with the SPAC and to effect Grab's initial public offering.

Defendants claimed that Grab was worth a wopping $39.6

O37BGRAO

billion at $10 a share.  After the disastrous SPAC, it's now worth less than a third of that.  Specifically defendants inaccurately state that, one, Grab had sufficient drivers; two, Grab was then reducing incentive payments; and three, Grab's profit margins were improving and sustainable.  Your Honor, this case primarily concerns section 11 and section 14 claims that do not sound in fraud.  The complaint also alleges in the alternative a section 10(b) claim against a subset of defendants, Anthony Tan, Ming Maa and the company.

THE COURT:  Your 10(b) claims are only with respect to post-merger statements; is that correct?

MR. O'CONNELL:  That is correct, your Honor.  They rely on distinct facts, and we disclaim those allegations when it pertains to the section 11 and 14 claims.

THE COURT:  Thank you.

MR. O'CONNELL:  So regarding the misrepresentations in the registration statement.  These misrepresentations were exacerbated by inaccurate risk disclosures that falsely describe actual events as mere hypothetical possibilities.  For example, that Grab may increase incentives in the future.  And if it did so, profitability would suffer.  Grab's statements were materially misleading because a reasonable investor would significantly -- it would significantly alter the total mix of information.  The registration statement also purported to reflect extensive due diligence and directed investors not to

O37BGRAO

do their own research.

Now defendants had tried to point to selected incomplete disclosures that are buried in the 633-page registration statement, but these are woefully insufficient, and frankly they're grasping at staws. Regarding the driver shortage issue.  In the registration statement, defendants fail to disclose that Grab was then experiencing a driver shortage. Grab was facing a significant decline in drivers in Q3 2021, and leading up to its IPO.  But defendants didn't disclose the shortage in the registration statement.  You just heard counsel for the defense talk about how they may experience supply constraints, or they may experience oversupply constraints. They didn't disclose that there was a severe supply constraint at that time.

And the registration statement also talks about in the hypothetical, if driver partners are not attracted to the Grab platform, the company may lack a sufficient supply.  The law is well-settled these hypothetical warnings don't eliminate liability when the risk of warning has already materialized.

Regarding the statements regarding reducing incentives.  At the time of the IPO, which was towards the end of the fourth quarter 2021, Grab was increasing its quarterly driver and partner incentives to nearly $600 million, 583 million to be exact. This was more than the prior year, about double what it was a year over year.  And to give some

O37BGRAO

perspective on how brutal this increase was, Grab's net revenue that quarter was only $122 million. So nearly all of its revenue was eaten away at by these incentives. And the registration statement just doesn't explain this trend that was going on at the time.

Now as to the Q3 2021, it is true that Grab had a slight increase in incentives from the prior averages. I believe it was 470 million compared to -- 458 million compared to about 370 million average. But what it didn't -- the registration statement didn't explain, and actually directly contradicted, that at the time Grab's incentives were frankly exploding. Peter Oey made statements about, We're continuing to see a trend toward profitability. You can't say that and then simultaneously have this massive incentive program that's going to eat away at all your revenue.

I heard what defendant said about the 2019 incentives, and frankly the 2019 incentives were less on average than the Q4 2021 incentives, 2019 incentives on average were 524 million per quarter. Defendants didn't disclose that there was going to be that they were in the midst of this explosive trend in incentives. They intend painted the opposite picture.

THE COURT:  How did they paint that opposite picture given what Ms. Saltzstein cited to in terms of third quarter result, etc.?

MR. O'CONNELL:  During the third quarter for instance

O37BGRAO

Peter Oey said that they were experiencing a trend toward profitability, and that it has, past and present tense, and may continue to seek to reduce incentives. It talked about how its ability to reduce incentives was key to its profitability. It didn't disclose that at the time incentives were essentially doubling.

THE COURT: You're saying that these third quarter results don't show that incentives are increasing?

MR. O'CONNELL: They show that incentives were increasing, your Honor, but they don't disclose this trend toward essentially eating -- towards the incentives essentially eating up all of Grab's revenue.

THE COURT: What more in your view needed to be disclosed other than the fact that the incentives were actually increasing to disclose that incentives could increase?

MR. O'CONNELL: Well, your Honor, I'm not going to write their registration statements for them. But, for instance, I'll tell you what they didn't disclose. They didn't disclose that the incentives were in the midst of greatly increasing; that as a total amount and as a percentage of GMV, they were in the midst of increasing 33 percent relative to prior quarter averages. They also didn't disclose that it was going to frankly eat away at margins. They were in the midst of experiencing a loss of over a billion dollars that fourth quarter.

O37BGRAO

And it's what I think you alluded to earlier, these half truths of saying, we have reduced incentives and make seek to continue to do so in the future.  So you're talking about what we've been doing, what we're going to do, but you're not saying at the exact moment and incentives were exploding.

THE COURT:  Thank you.

MR. O'CONNELL:  I do want to talk about the statements regarding improving profit margins.  Grab also made several false and misleading statements that its profit margins were improving and sustainable.  Specifically defendants said that its flywheel effects meant merchant and driver partners remain loyal to the platform.  And they claim that consumer demand for deliveries allowed Grab to sustain supply network of our business in a truly cost effective way.

The incorporated statements inaccurately is how did Grab continue to demonstrate the strong trends toward profitability, and that they would continue to execute sustainable and improving margins.  So these statements emphasize driver loyalty and a continued trend to profitability were not accurate.  By this time as we discussed earlier, Grab was experiencing a severe driver shortage and was rapidly increasing the incentives spending.  So at that time the margins were a far cry from sustainable or improving.

I should add, your Honor, that all these statements we've been discussing today, they were clearly material.

O37BGRAO

Materiality is a mix question of law in fact, generally not appropriate for resolution on the pleadings.  But here it's not a close call.  The misstatements involve Grab's most important business, delivery and ride-hailing, and its most important metrics, revenue and profit.  These topics play a significant role and are clearly material.  And as the amended complaint details, defendants repeatedly conceded that reducing incentives while maintaining profitability were crucial.

And I should add, your Honor, analysts understood that these statements were important.  For example, ten days after the IPO, a UBS analyst report noted that -- noted the importance of these claims that it "manage to keep incentives for consumers and drivers in check."  When we were talking early about the Q3 2021, this is what analyst understood Grab was saying, that they were keeping the incentives in check while still maintaining demand.  Any fair reading, your Honor, most can see that the false statements were highly important, and obviously not so unimportant to warrant dismissal.  Nor were these statements mere corporate optimism.  The statements when read in context show that was actually going on at the company was wholly at odds with defendant's descriptions.

I do want to talk briefly about, I heard some allusion earlier to bespeaks caution. These statements were not forward-looking.  Where we're talking about has reduced incentives and may continue to reduce in the future.  That

O37BGRAO

include past, present and future.  So aside from the issue of the PSLRA Safe Harbor not applying to public offerings.  When read in context, the defendants are talking about a current and ongoing trend, which is not forward-looking.  I want to also talk about item 303 which requires disclosure of material trends, and to the extent the reported financial information is indicative of future results.

THE COURT:  Mr. O'Connell, before you do that, with respect to the 303 claim, you are relying on 17 CFR Section 299.303 (b)(2)(ii).  Is that correct, that's the section you're focused on?

MR. O'CONNELL:  Yes, that's correct.

THE COURT:  Thank you.  Go ahead.

MR. O'CONNELL:  So here by the time the registration statement was published, existing driver shortages and incentive increases were already negatively impacting Grab's future financial condition and results, such that prior results were unlikely to be -- and in fact were not indicative of future results.  And defendants had an obligation to disclose these risks and the potential future impact in the registration statement.

THE COURT:  Do you have to allege facts supporting an inference that management actually knew about the trends when it filed the proxy?

MR. O'CONNELL:  It doesn't go all the way to knowledge

O37BGRAO

in the way scienter would, but we do allege that it would be plausible to know this information.  This gets back to defendants said they monitored the trends, and it talks about how they preemptively invested in these incentives to get a driver supply.  And I should add, your Honor, that the registration statement mentions the word "incentives" to 247 times.  It's possible more if Control F got tired when I was searching it, but it's at least 247 times.  This isn't something they weren't paying attention to.

I want to talk briefly about this whole -- defendants in the brief and I think they alluded to it, talk about how it wasn't -- basically it wasn't a long enough trend.  I would just say in the Second Circuit there's no bright line rule about the length of a trend.  What triggers the duty is if there are intervening events that -- sorry.  The intervening events that trigger the duty to disclose or as necessary to make the disclosures under item 303 accurate and complete as of the time the registration became effective.  Here, Grab knew of the driver shortage and increasing incentives before November 19, 2021, and was required to disclose them under the registration statement.  Item 303 doesn't require this mechanical inquiry.

I do want to touch on section 14A as well.  As with the 11 claims, section 14A claims don't require scienter.  We allege a section 14A claim based on a negligently prepared and

O37BGRAO

misleading proxy registration statement.  Intent to defraud is not required.  Here, the section 14A cogently pleads that the registration statement deprived investors of material information needed to properly consider whether to redeem shares and/or approve the de-SPAC transaction.  Defendants don't really separately address this claim other than to state the pleading standards.  But to that I just want to emphasize it only requires negligence.

I do want to briefly talk about section 10(b) before I wrap up.  This is admittedly a much smaller part of the complaint with separately pled facts.  Like I said, section 11 and section 14, we explicitly disclaim averments of fraud.  But regarding the section 10(b) facts themselves.  There's two statements at issue.

First, defendants Maa responding to an interview question concerning the company's plans for profitability and a suggestion by a market research firm that the third quarter losses stem from big spending on advertising, promotions and incentives that create a challenge going forward.  Maa responded, we've made very good strides on improving our economics.  That wasn't true at the time he said it.  There were in the midst of an over one billion dollar quarterly loss.  The incentive cost were ballooning and exploding at the time.  They weren't improving their economics.  Regarding Defendant Tan's statements.  He also said that the margins are strong.

O37BGRAO

The margins aren't strong when you're losing a billion dollars. That's all I want to cover today, your Honor, unless the Court has questions.

THE COURT:  No, that's helpful.  Thank you very much. I'll hear you if there's any response by Ms. Saltzstein.  I have about five more minutes.

MS. SALTZSTEIN:  I know it's a busy day and we appreciate your time.

THE COURT:  I appreciate the argument.  Excellent argument by everyone.

MS. SALTZSTEIN:  Your Honor, quickly.  The registration statement.  Right.  Because that's where it begins and ends I think we would all say.  If you look at page 68 of the Edgar filing.  It's page 52.  I'm not sure which the Court has.  We keep hearing the word "may."  So 68, Grab has experienced, and expects to continue to experience driver partner constraints or oversupply from time to time in certain areas, including certain areas or locations within cities. Doesn't say "may."  I don't know what to say about that.

THE COURT:  What about the incentives?

MS. SALTZSTEIN:  With respect to the incentives, your Honor.  If you turn to page 338, which is the chart, and it's at 172.  There's a chart.  And the chart shows, partner incentives.  By the way, the incentive numbers are given from 2019 to 2021.  This particular page is showing quarter on

O37BGRAO

quarter.  The percentage change, partner incentives negative 187 million.  That's in 2021, third quarter.  Consumer incentives, negative 271 million, with a percentage change of 42 percent and 106 percent.  It's in the chart.

There's another chart, your Honor, on page 363 which is actually a really nice visual I think because it dispels.  What the plaintiffs had did here in their complaint is they just took an average.  They basically did math, but the registration statement -- to get to show that there was some consistency in the numbers, but if you look at -- I mean it's actually not accurate.  If you look at 363, which is the chart, it's a pictorial actually.  So if an investor wanted to see what the picture looks like, it's a pictorial.  And that chart shows that in the first half of 2021, this is under partner and consumer incentives, couldn't be any clearer, 10 percent.  Right.  The first half of 2020 is 12 percent.  2022, the full year is 10 percent.  I'm sorry, 2019 is 19 percent.

So there is a decline.  Right.  19 percent, 10 percent, 12 percent, 10 percent.  I'm not sure what else -- they were talking about, there was a decline.  Now there may not have been a decline quarter to quarter, but nobody said there was.

Margins.  We heard about margins.  Again, I'll turn to the registration statement at page 10 -- and I know the five minutes is up.  Segment adjusted EBITDA for 2021 of 345 million

O37BGRAO

was a margin of 12.4 percent on GMV for '21, which improved from 9.5 percent in 2020.  I won't go on to read it, but it's in there, your Honor.  Those are disclosed numbers.  That's what you're required to do.

Your Honor, with that, I think I will take a seat and let you get back to the jury.

THE COURT:  No.  Thank you.  Thank you very much.  I would assume that you're going to ask for the transcript.  And if you did that, that would be helpful to the Court as well, so I let you decide and work through that.  And I thank you all for your arguments.  They were excellent, and the papers are very good as well.

All right.  Thank you much, and we are adjourned in this case.

(Adjourned)