UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NORTHWEST BIOTHERAPEUTICS, INC.,

Plaintiff,

v.

CANACCORD GENUITY LLC, *et al.*,

Defendants.

------------------------------x

New York, N.Y.

22 Civ. 10185 (GHW)(GS)

Remote Conference

June 5, 2025

Before:

HON. GARY STEIN,

U.S. Magistrate Judge

APPEARANCES

COHEN MILSTEIN SELLERS & TOLL PLLC
Attorneys for Plaintiff
BY: LAURA H. POSNER
RAYMOND M. SAROLA

MORRISON & FOERSTER, LLP
Attorneys for Defendant Canaccord Genuity LLC
BY: ERIC LAWSON
ANTHONY S. FIOTTO, JR.

SIMPSON THACHER & BARTLETT, LLP
Attorneys for Defendant Citadel Securities LLC
BY: JONATHAN K. YOUNGWOOD
STEPHEN P. BLAKE
KATE LAMBROZA

APPEARANCES
(continued)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorneys for Defendant Citadel Securities LLC
BY: CHRISTOPHER D. KERCHER
PETER H. FOUNTAIN
LEIGHA EMPSON

BALLARD SPAHR, LLP
Attorneys for Defendant G1 Execution Services LLC
BY: LAUREN ENGELMYER
JOHN CHESLEY BURRUSS

KATTEN MUCHIN ROSENMAN, LLP
Attorneys for Defendant GTS Securities LLC
BY: LEIGH BRISSENDEN
MITCHELL E. CAMINER

GREENBERG TRAURIG LLP
Attorneys for Defendant Instinet LLC
BY: DANIEL P. FILOR
NICHOLAS BARNES

KATTEN MUCHIN ROSENMAN, LLP
Attorneys for Defendant Lime Trading Corp.
BY: KEVIN P. BROUGHEL
ZOE LO

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
Attorneys for Defendant Virtu Americas LLC
BY: AUDRA J. SOLOWAY
DANIEL NEGLESS

Also Present:

Alexis Armfield, Summer Associate, Greenberg Traurig, P.A.

THE DEPUTY CLERK: In the matter 22 Civ. 10185, Northwest Biotherapeutics, Inc. v. Canaccord Genuity, LLC, *et al.*

Counsel, will you please state your name for the record, starting with the plaintiffs?

MS. POSNER: Good morning, your Honor. Laura Posner, from Cohen Milstein Sellers & Toll, and with me is my colleague Ray Sarola.

THE COURT: Good morning to you both.

MR. YOUNGWOOD: Your Honor, for the defendants, I'm not sure what order we should go in, but I will start. Jonathan Youngwood, Simpson Thacher. Mr. Blake and Ms. Lambroza are on with me from Simpson Thacher, and my colleagues at Quinn are also on and can introduce themselves.

MR. KERCHER: Good morning, your Honor. Christopher Kercher, from Quinn Emanuel, for Citadel Securities, and with me are my colleagues Peter Fountain and Leigha Empson.

THE COURT: Good morning to all of you.

Mr. Youngwood, who do you represent?

MR. YOUNGWOOD: We represent -- all the defense lawyers who just introduced themselves represent Citadel.

THE COURT: You represent Citadel, as well?

MR. YOUNGWOOD: Yes.

THE COURT: Okay. Very good. Okay.

MS. SOLOWAY: Good morning, your Honor. Audra

Soloway, from Paul Weiss. I'm on with my colleague Daniel Negless, and we represent Virtu.

THE COURT: Good morning.

MR. LAWSON: Good morning, your Honor. Eric Lawson from Morrison & Foerster, LLP, on behalf of Canaccord Genuity, LLC, and I am on with my colleague Anthony Fiotto.

THE COURT: Good morning.

MR. LAWSON: Good morning.

MR. FILOR: Good morning, your Honor --

MR. BROUGHEL: Good morning, your Honor -- go ahead, Daniel.

MR. FILOR: Good morning, your Honor. Dan Filor, and with me is my colleague Nick Barnes and summer associate Alexis Armfield, from Greenberg Traurig, for Instinet.

THE COURT: Good morning, including to the summer associate. Welcome. And who do you -- I'm sorry, you represent Instinet?

MR. FILOR: That's correct, your Honor.

THE COURT: Okay.

MR. BROUGHEL: Good morning, your Honor. Kevin Broughel, from Katten Muchin Rosenman, on behalf of defendant Lime Trading Corp., and with me is my colleague Zoe Lo.

THE COURT: Welcome to the party.

MR. BROUGHEL: Thank you, your Honor.

MS. BRISSENDEN: Good morning, your Honor. Leigh

Brissenden from Katten Muchin Rosenman, with my colleague Mitchell Caminer, on behalf of GTS Securities, LLC.

THE COURT: Okay. Good morning to you, as well.

MS. ENGELMYER: Good morning, your Honor. Lauren Engelmyer, from Ballard Spahr, and with me is my colleague Chesley Burruss, on behalf of G1 Execution Services.

THE COURT: Good morning to you also. I think that accounts for everybody.

All right. We are here for an initial case management conference. Let me ask—and I will direct this to the Citadel lawyers in the first instance, given past experience—is there going to be one counsel representing all the defendants for purposes of --

MR. YOUNGWOOD: Your Honor --

THE COURT: Taking the lead on behalf of all defendants may be a more suitable way of saying it.

MR. YOUNGWOOD: I think that's probably the more accurate way, your Honor, yes. I'm going to try to speak for all defendants. Obviously everyone is here if I miss something and has something specific to one, but you should not have to hear from all of us.

THE COURT: Okay. That's appreciated. Thank you.

Okay. I have reviewed your proposed case management plan and scheduling order. I realize there are some disputed issues there. We will get to those in a moment.

Given the briefing on the motions——plural——to dismiss, I don't think I need anybody to tell me what the case is about, but I will give both sides an opportunity to tell me anything you would like to tell me at the outset before we plunge into the details of the case management plan, including whether any of the disputed issues raised in that filing have since been resolved or there has been a narrowing, at least, of the scope of the dispute.

MS. POSNER: Your Honor, Laura Posner, on behalf of the plaintiff.

Unfortunately, there has not been further narrowing of the disputed issues.

THE COURT: Okay. And anything you want to tell me before we start?

MR. YOUNGWOOD: Nothing, your Honor, except I suppose one of the disputed issues, we did not exchange initial disclosures on May 30, so perhaps that's been mooted to some degree. We would love to get them as soon as possible. They have agreed to 9. I assume it will end up being June 9. I don't know that we have discussed that extensively.

THE COURT: All right. Well, let's start. And that was kind of the first thing on the list, initial disclosures.

Are you both on board for June 9, four days from now?

MS. POSNER: That is fine for plaintiff.

MR. YOUNGWOOD: Yes, your Honor.

THE COURT: June 9 it is.

Amended pleadings. Okay. So, as I understand it, Ms. Posner, your proposal is that you have until 30 days after substantial completion of document production. That date is August 29, if I understand it correctly, which would mean you would have until September 29, and the defendants' proposal is amended pleadings are due by June 30.

And I do appreciate both sides having laid out, at some length, your positions in writing in the CMP. That's very helpful.

Anything you want to add to that, Ms. Posner?

MS. POSNER: I will just add, in addition to what we briefed in the proposed scheduling order to your Honor, is that on Friday -- last Friday, in the Mullen action, the Court issued an order in which it agreed to a 12-month discovery deadline; and, in that proposed, I guess it was a letter that he so-ordered, it was clear that the parties agreed at a minimum to allow the plaintiff to amend two and a half months after production of all of the transaction records in that case. The plaintiff was asking for a longer period of time to amend, and the judge has not ruled on that specific issue as of the order on Friday.

THE COURT: I see that. I have it up on my screen.

Also the request there, even under the defendants' proposal, is for amendments to be made some three months before

the deadline for substantial completion of document production, whereas your proposal is that you have until 30 days after substantial completion of document production to amend your pleadings, correct?

MS. POSNER: Correct. They had agreed to a staggered production in the Mullen action, where the defendant would produce all transaction records by an earlier date and the motion to amend is teed off of that deadline. We would similarly agree to a staggering of production here. If the defendants wanted to produce all of their transaction records by a specific date, we could amend within a certain period of time after reviewing those transaction records. But because we didn't have that separate additional deadline, we didn't think it was appropriate here, and we don't know when we will get the transaction records from the defendants.

THE COURT: But even if you get transaction records, would they really have a material bearing on the two issues you identify as potential amendments in the same way bringing in clients of the defendants and/or resurrecting your long-term price impact theory -- I'm not sure how getting the transaction records would really have a bearing on that.

MS. POSNER: Well, so the transaction records should at least tell us about other transactions at issue. So we only have access currently to the publicly available information from the -- I will call them the light pools of trading. We

are quite certain that there were additional transactions in Northwest Bio by the defendants, potentially other third parties, in dark pools that we do not have access to. So it's entirely plausible that there are additional spoofing episodes as well as the identification of additional parties that would be relevant from those transaction records.

It is also true that those transaction records should show, based on how we have drafted our RFPs to the defendants, who the transactions were on behalf of. So if it was on behalf of a specific client, which is one of the arguments the defendants have raised here, we should have that information, as well.

THE COURT: That still wouldn't give you enough of a basis to sue the clients --

MS. POSNER: I don't know.

THE COURT: -- I would think.

MS. POSNER: I mean, it entirely might. It may not. We will have to see specifically what the transaction records show, if they show specific spoofing episodes, if they show that the client was somehow –– you are correct. We are not going to have an e-mail, right, from the client to Citadel saying: Issue this at this time and this place. That is correct, which is really why we have asked for 30 days after all of fact discovery.

But I understand also the issue that the defendants

are raising, and we don't want to extend the briefing schedule and the ability to amend, you know, forever. To the extent we can at least see the transaction records, I think that will have a decent impact, at least on the loss causation issue. It may bear on the additional defendant/customer issue.

THE COURT: All right. I will tell you how I view this one. I am inclined to agree with the defendants on this one. This is a 2022 case. You have amended your complaint twice. You point out a couple of areas where amendments might be appropriate based on how discovery pans out. But it seems to me, in both instances, a better case management practice would require you to show good cause before making those amendments rather than having a unilateral right to amend. I think that's particularly true with regard to the long-term price impact theory which, as you know, has been the subject of extended briefing and decisions by myself and Judge Woods already in this case.

In saying that, obviously, it doesn't mean that you can't amend the complaint after June 30. It just means that you have to show good cause to do so. If discovery reveals documents, at whatever juncture, that present new facts that you feel warrant the inclusion of additional defendants or additional claims or allegations or resurrecting the long-term price impact theory, you would be free to seek that relief; and, as a general rule, where there are new facts that warrant

amendment to pleadings, the Court would be inclined to grant that relief. But I do think you should have to go through that hoop rather than having, at this point in the case, the right to amend unilaterally. I think --

MS. POSNER: Yes --

THE COURT: Anything further you want to say on that issue?

MS. POSNER: Yes. I guess –– and I understand that. I guess just from a case management perspective, my concern is that we then have to move to amend, show good cause, brief yet again a third motion to dismiss, and I think the argument from the defendants is going to be it's too late, we haven't been permitted to get whatever additional discovery we need on this issue, we are prejudiced by allowing amendment at this late stage. So my concern is that, by punting it, we are causing more headaches from a case management perspective.

And, quite frankly, I feel confident that we are going to amend here at some point in time, based not only on the defendants' own defenses here and what they are claiming occurred both in their arguments to your Honor in the motions to dismiss, but also in their answers, but also based on loss causation. And I am trying to avoid a situation in which we are six months, eight months down the road and having to engage in this process again, burdening the Court again, and having the defendants argue that they have somehow been harmed by not

being able to obtain the discovery or make the arguments they wanted to make earlier.

THE COURT: I am not sure how or why they can make that argument. I am sure they will make arguments. They may well be inclined to oppose whatever you suggest. But none of what you said really convinces me of the wisdom as to why you should be allowed to amend on these bases in particular without first making some threshold showing of good cause.

Mr. Youngwood, anything you want to say on this issue?

MR. YOUNGWOOD: No, your Honor. I think we thought June 30 was plenty of time, given that it will be the third amendment. If they have an amendment, they should do it now. If something happens later that creates good cause, we will either agree it is good cause or we will litigate whether it is good cause.

THE COURT: All right.

The next issue is the deadline for fact discovery. They were all deadlines. Plaintiff proposes April 30, 2026, which is about ten-plus months from now; defendants propose November 13, 2025, which is about five months.

Let me just give you my initial thoughts and then either of you can comment.

On this one, I tend to agree with plaintiff. This is a relatively complex case. We have seven different defendants.

The document discovery, even if it is limited in the way defendants propose, is likely to be reasonably voluminous. Based on the proposed case management plan, it sounds like there are going to be an abundance of depositions. Given the skill and determination with which the case has been litigated so far, I am going to go out on a limb and predict that there may be discovery disputes. And so I just don't think five months is a realistic deadline in this case.

I think the plaintiffs' proposal is far more realistic and I would rather give a somewhat (audio disruption) date, although I'm not sure I'd even (audio disruption) particularly generous than to set an unrealistic date that only results in motions to adjourn. So that is my -- a motion to extend the discovery deadline, I should say.

So that is my inclination; but, Mr. Youngwood, I am happy to hear from --

MR. YOUNGWOOD: No, thank you, your Honor. And I, of course, understand what you have already indicated.

I guess I would point out the following:

Notwithstanding the fact that we are on two Teams screens here and there are a lot of people and there are different parties and we are separately represented, we think this is a fairly narrow case following your report and recommendation that the judge has adopted. The plaintiffs seem to feel differently and work tends to expand to fill the time.

That is my experience, not just in litigation but, I think, in life.

And so we are concerned that the longer we put, the more discovery disputes you will get, the more paths we will go on that stray from what the case appears to be about. I won't repeat that. You are very familiar with it. We both outlined our positions in the proposed schedule to you.

I will note that one thing, fortunately, we have all agreed on is a substantial completion deadline of August 29 of the documents. The documents are going to be done by then.

What, then, is at issue is how much more time do you need to complete depositions or take depositions. You know, we are proposing two and a half months, and they are proposing, I guess, another five and a half months after that. That is a lot of time for depositions.

My second observation is that whatever deadlines we end up setting at the beginning of the case, somebody comes to you and asks for an extension at some point, and that is going to happen whether we put a far-out date or a nearer-term date. So my only suggestion/request would be if November 13 is too soon, I think April 30 is too late as an initial date, and perhaps we could move that closer to the beginning of the year. And I think that will just keep our feet to the fire.

We would —— our clients believe this is going to be a summary judgment case. We would like to get there as fast as

possible. We would like to limit expenses. And I think the longer there is for discovery, the more expenses there is going to be and just delaying the inevitable.

So with the understanding that somebody may come to you for an extension, we would love the first deadline to be a lot more near-term than April 30.

THE COURT: Ms. Posner, do you have any objection to moving it up by --

MS. POSNER: I do, your Honor. As you know we obviously have a very different opinion with regard to the scope of the discovery here. And while we have agreed to a substantial completion deadline, if Harrington is any example, that production is going to be incomplete; and if defendants' position in the case management plan with regard to the scope of discovery is any indication, as your Honor indicated, I anticipate that we are going to see multiple motions to compel and motions to quash here.

We are also dealing with discovery from third parties, including FINRA and the DTCC, which obviously are not obligated to comply with your Honor's deadlines, and I think likely other third parties, once we are able to obtain the information that we need from the defendants with regard to their customers and clients, which is going to also necessitate subpoenas to third parties.

I just don't see any world in which we -- I am unaware

of any securities case, quite frankly, from the smallest to the largest, involving one corporate defendant and two false and misleading statements, that is anywhere able to be done in five and a half months or seven and a half months. In fact, I have never -- I have probably negotiated 30 of these. I don't think I have ever had a dispute with the defendants that it will take close to a year to do fact discovery. And we are talking here seven corporate defendants.

THE COURT: I take it the August 29 deadline for substantial completion of document production refers only to the parties' document production. It doesn't -- it is not a deadline for third-party --

MS. POSNER: Correct. We obviously can't hold third parties to any such deadline.

And your Honor, while we have served our requests for production on the defendants, only Citadel has served discovery requests on plaintiffs as of today. So we are not going to engage in seven different searches of seven different custodians with seven different sets of search terms. The defendants are going to have to get on the same page, and we are going to have to have a meet-and-confer about what the scope of that discovery is for my client, as well. And I haven't even gotten RFPs from most of the defendants as of today.

THE COURT: All right. Thank you.

I am going to adopt the plaintiff's proposal for the overall fact discovery deadline and set that as April 30, 2026.

Okay. Initial document requests. I think you are both proposing June 12. It sounds like the plaintiff has already propounded theirs. Any disagreement on that date or is that June 12 still the agreed-upon date?

MR. YOUNGWOOD: I think that is the agreed-upon date. The only discrepancy is we would also suggest that initial interrogatories be served by that date, too, and we don't have agreement on that.

THE COURT: Right.

So on that, Ms. Posner, it is just a deadline for the service of initial interrogatories. It doesn't mean that you are precluded from serving interrogatories after that.

I think the defendants propose, and I would agree, that all interrogatories would need to be served 45 days prior to the deadline for fact discovery so that it can be complete by the fact discovery deadline. As I think all of you know, that is the expectation in this Court, that the fact discovery deadline means discovery is over -- fact discovery, at least, is over by that date, not a deadline for submitting additional requests for production of (audio disruption) interrogatories or depositions and so forth.

So I will hear you on that, but I am inclined to have

an earlier date for initial interrogatories.

MS. POSNER: With that understanding, Judge, that is fine. That is actually the language we tried to get the defendants to adopt, that it wasn't that they had to be served by June 12, but that they could be served subsequently, after June 12, but as long as it was completed within 45 days from the end of fact discovery.

THE COURT: Well, and it's a little bit of an oddity the way the template is prepared, but I do intend to set a deadline for initial interrogatories by June 12. So I think that means, unless the defendants agree otherwise, if you don't serve any interrogatories by June 12, you couldn't do it thereafter.

MS. POSNER: I mean, if — I suppose I can serve an innocuous interrogatory right now. I don't think it's particularly efficient or effective to be serving interrogatories when we don't have the information in front of us to make that interrogatory meaningful, which is why, at least in my experience --

THE COURT: Interrogatories are limited here to begin with.

MS. POSNER: Exactly, which is why I think wasting them when I don't have full information or any information from the defendants is not particularly useful. It is why I think Judge Woods, in both the *PSG* case, as well as the *Stone* case,

in which Quinn Emanuel represents the defendant, the Court entered deadlines for service of interrogatories, I think, in those cases, it was both 30 days before the end of fact discovery.

But that is typically my experience in securities cases, that rather than force the plaintiff, who is at an information disadvantage, from wasting interrogatories by serving by early date, that they just have to be completed by a deadline before the end of fact discovery.

THE COURT: All right. That makes a certain amount of sense.

I will tell you what. I am going to set the deadline for interrogatories for September 29, if that is not a weekend date, which is 30 days after the deadline for substantial completion of document production. That should be ample time.

All right. Requests to admit. You are in violent agreement on 45 days before the deadline for fact discovery. Is that correct?

MS. POSNER: Correct.

THE COURT: And you propose that the deadline for depositions be the same as the deadline for fact discovery deadlines. That is fine with me.

I also didn't see any disagreement with regard to expert discovery, and the parties' proposal with respect to expert discovery is also fine with me.

E-discovery protocol, you have a deadline of June 5, which happens to be today. Is that still the deadline you would like?

MS. POSNER: Unfortunately, we are also in disagreement about both the ESI protocol and the protective order as of today.

We proposed to the defendants during a meet-and-confer earlier this week that if the parties are still in disagreement on those two issues by Monday, the 9th, that we exchange our positions by the 11th, and then serve our competing versions to your Honor by Friday, the 13th.

I don't know whether the defendants agree with that proposal. They have not responded to us.

And hope springs eternal. Perhaps we will be able to reach agreement on one or both of those items. But my intuition is that we will have some competing positions in both of those items.

THE COURT: Okay. Mr. Youngwood?

MR. YOUNGWOOD: Your Honor, we do have disagreements. I think we are continuing to try to work them out. If we can't work them out, they may end up in front of you. I'm sure that's the last thing you want.

So I guess my suggestion is you give us a little bit of time, and probably a deadline would help. And if we can't, we will submit something like this, and whichever paragraphs we

disagree on, I guess, will go to you.

So whatever reasonable schedule we will live with. A deadline will probably help us to decide if we have a fight or not.

THE COURT: What would you propose for a deadline? June 16?

MR. YOUNGWOOD: That's fine. That's fine, your Honor.

THE COURT: Ms. Posner, I know you suggested something a little more accelerated but --

MS. POSNER: That's fine, your Honor. I think it is important that these issues get worked out before document production and the scope of document production, so that's my only request.

THE COURT: Okay. I certainly encourage, to understate matters, that the parties continue to meet and confer and attempt to reach agreement on issues like this. It is very important that parties be able to work these things out. It is really to the advantage of both of you, I think, to have agreements in place. But if you can't reach agreement, that is what I am here for.

All right. So we will set the actual deadline for the e-discovery issue in the CMP as June 16, recognizing that that is a deadline for either having your protocol in place or having a joint letter to me where you each set forth your respective positions.

Is that how we should do this?

MS. POSNER: I think that's the most efficient. And if -- your Honor, if we could also set that deadline for any disputes about the protective order, as well?

THE COURT: Sure. That's not part of the case management plan, but I hear you that there is a brewing discovery issue on that. And so unless Mr. Youngwood objects, June 16 can be the deadline for that, as well.

MR. YOUNGWOOD: That's fine. So either we have reached agreement or we are submitting a letter where we each put our positions, like the proposed case management plan.

THE COURT: Yes. Unless the issues are related——and they might be——maybe it is easier for me to have two letters.

MR. YOUNGWOOD: Okay.

THE COURT: Thank you.

And just to be clear, meaning two letters on the two separate issues. Each letter would be a joint letter——one would be devoted to the e-discovery issue; one would be devoted to the protective order.

Okay. Well, I think that brings me to the issue regarding the scope of discovery in light of the ruling on the motion to dismiss.

But before we get into that, is there any other issue we should be discussing?

MR. YOUNGWOOD: Your Honor, only just -- maybe just to

put a marker on one thing.

Ms. Posner, I think, in response to one of your questions, made a comment that the defendants all need to get on the same page with respect to their document requests.

Citadel did serve document requests almost a month ago. We expect responses to those timely. I don't think -- this fact that I am the only defendant who has spoken to you today, we are trying very hard to be coordinated. We are practical. But the plaintiff has a responsibility to respond to each defendant that they chose to sue's requests for discovery, by its nature, and I don't think that we should be waiting to start discovery on the plaintiff until every defendant has made known whatever their individual requests are. The rules allowed us to serve requests. They served them on us, we served them on them. We are hoping for responses on a timely basis.

THE COURT: Well, I appreciate that, but doesn't it make sense for there to be coordination, or at least for the plaintiff to have everyone's document requests before they start running searches, either electronically or otherwise, pull out documents that meet all of your needs, then they have to go back and redo it because Instinet decided to ask for something different, which, of course, they have the right to do. It does seem to me to be more sensible to -- for the plaintiff to have all of the requests before them.

MR. YOUNGWOOD: I guess, respectfully, your Honor, I'm not sure that it necessarily needs to work that way. If somebody other than Citadel has an incremental request, there will be an incremental request. But if they are pulling custodians, they are pulling custodians. If they are running serve terms, they are running search terms. And the suggestion that no discovery starts until every defendant has done everything they want, the deadlines we have set won't work at all.

THE COURT: Well, to be sure, there can be incremental requests and they may –– different defendants may have different specific incremental requests, but it still seems to me that having a core document request from each of the seven defendants, to the extent you are propounding separate ones, before the plaintiff undertakes the burden and effort of responding does make sense.

Ms. Posner, do you ––

MS. POSNER: No, your Honor, I think that --

THE COURT: -- disagree?

MS. POSNER: -- is certainly what I hear from the defendants on a regular basis when there is one corporate defendant. I get told that they need to know all of the search terms and all of the custodians that are agreed upon before they conduct searches, and certainly getting seven different requests and different custodians and search terms is going to

be overly burdensome and overly costly for my client.

We are happy to respond with our responses and objections to Citadel's requests for production, which we intend to do. I believe they are due on Monday. We will do that. But we do not believe we should be having to run seven different searches, review seven different times the same documents or some incrementally different documents or new and different custodians each time a defendant decides to serve document requests.

THE COURT: I have to say I agree, Mr. Youngwood.

MR. YOUNGWOOD: Okay. I understand, your Honor. But they choose to serve seven different defendants. They all have their rights to seek documents about themselves and about the case. So I think we will, again, work to be efficient, and I am pleased Ms. Posner will respond to our requests on Monday.

THE COURT: Very well. To be clear, she said, I'm sure you heard it, that she is going to give her responses and objections. It doesn't sound to me like ——

MR. YOUNGWOOD: Given --

THE COURT: -- she is going to be giving you documents.

MR. YOUNGWOOD: I didn't expect a truckload of documents to show up on Monday, your Honor.

THE COURT: Okay. All right. Thank you.

All right. So let me give you my initial reaction to

your dispute over what the scope of discovery should be in this case.

First of all, I agree with defendants that the ruling on the motion to dismiss does have consequences for the scope of discovery in this case, at least it does in my mind.

While plaintiff adequately pled certain of the elements for all 2800 spoofing episodes, and I think I held as much, that doesn't mean they are all still in the case. Because, as to many of them——I believe most of them——one essential element, namely, loss causation, was missing. And that is because they weren't linked to a sale by NWBO for purposes of loss causation.

So there may be other reasons why other spoofing episodes or maybe even all of the spoofing episodes in the original complaint can be relevant, but I need to hear why that is.

It also does seem to me that, as narrowed by the ruling, the damages involved in this case may be rather limited. In my report and recommendation, I did a kind of back-of-the-envelope calculation with respect to the October 12, 2020, transaction, and I don't remember the number offhand. I think it was, like, $48,000. And I appreciate that that is not at all necessarily what the alleged damages would be on that one transaction. It might be somewhat different.

I am also not sure that the defendants' effort to

extrapolate from that to an overall damages figure is valid. But in terms of order of magnitude, I am not sure that this is an eight-figure case or even a seven-figure case, in terms of the alleged damages, in light of the loss causation rulings to date.

So I would like to ask Ms. Posner, do you have a damages calculation in view of the Court's ruling on loss causation? Based on that, is this an eight-figure case, a seven-figure case, a six-figure case?

MS. POSNER: So, your Honor, as I am sure you know, damages are subject to expert analysis. And in this case, it is particularly complex expert analysis that will be required here.

I will also add that damages from spoofing is a highly contested issue that does not have any prior precedent in any court; and, as such, I think it is going to be subject to significant motion practice both at summary judgment and in terms of expert analysis.

We have been working with Professor Milgram, Dr. Milgram, who you are probably familiar with from the case. We are certain that the damages in this case are nowhere near six, seven, or eight figures. We think they are significantly higher.

And more importantly, for purposes of discovery at this stage of the litigation, we don't think that's an

appropriate consideration because it has not been subject to litigation or expert analysis, all of which we are entitled to explore through discovery and expert reports.

And certainly, as your Honor recognized even in the motion to dismiss reports and recommendations, the methodology in which the defendants are calculating damages here is not at all consistent with the plaintiffs' theory of the case, and it is also not even consistent with their own positions in the case. So respectfully, your Honor, we don't think the number is anywhere near that. We think it is many multiples higher and, more importantly, don't think it is appropriate for resolution at this time.

I will also note for purposes of discovery that, besides the fact that I think this is an entirely premature conversation to be having, we haven't even received and responded to the defendants' requests, they haven't responded to our requests, so I don't even know what the specific items are that they are objecting to; but even if you were to limit discovery to the issues at hand, your Honor has held that we pled sufficiently manipulative acts, scienter, reliance with respect to all 4400 spoofing episodes alleged in the complaint, certainly the transactions, the trading algorithms, the information about the methodology in which they are engaging in those 2400 transactions is relevant to scienter even for just those spoofing episodes for which you have currently found we

have alleged loss causation.

As your Honor knows, the scope of discovery is very broad. And I can't imagine a situation in which we would be limited to only discovery with regard to those specific transactions, even though there has clearly been held to have been a pattern and practice of manipulative spoofing, over 2400 episodes.

I will also note that with regard to the 94 episodes for which your Honor has found loss causation, they occur over the course of the entire relevant period here. It is not like they are all within, you know, the first six months of the relevant period or all at the end of the relevant period. They go over the scope of the entire relevant period. And as a result, the defendants' trading, their policies and procedures, their trading algorithms, their compliance over that period is clearly relevant to the spoofing episodes that are at issue.

So while I don't know what the specific categories of documents are the defendants are trying to not produce in this case, I can't imagine a situation in which transaction records, trading algorithms, compliance, oversight, policies and procedures, all of the plethora of things that we have requested in our document request, would not be relevant to, at a minimum, scienter and manipulative acts.

THE COURT: All right. We will hear from

Mr. Youngwood, but I'm not sure that I disagree with you that things like the trading algorithms during the time period and the policies and procedures during the time period are not relevant.

But I do understand them to say that detailed document production on all of the thousands of spoofing episodes that, at least at the moment, are not in the case is unwarranted. And I do have to take into account, under Rule 26, not only relevance, but proportionality and including specifically the amount in controversy.

And so I just want to go back to make sure I understood what you said before. You are saying this is not a six- or seven- or eight-figure case? It's a nine-figure case? You mean NWBO's damages are in excess of $100 million based on my R&R that was adopted by Judge Woods?

MS. POSNER: Even based on your R&R, as adopted by Judge Woods, which went to loss causation, not damages specifically, I don't –– I can't tell you --

THE COURT: I don't understand that. I don't –– that just does not seem credible to me.

Again, this is not an action by the SEC covering all damages (audio disruption) spoofing. It's not a class action. It's just damages that NWBO can claim as a result of its being a participant in the markets (audio disruption) under the facts that you have alleged as a seller of its stock on specific

dates. How do you get to $100 million?

MS. POSNER: I understand, Judge, and I understand that you might have a different view of that at this point in time.

I think it is difficult for me to sit here, without the benefit of discovery, without the benefit of expert analysis, to demonstrate to you why the damages are what we think they are. Whether they are in excess of 100 million, I can't answer that for you sitting here today, but I could tell you they are nowhere near six, seven figures.

And with regard to your point about burden and the amount in controversy, certainly that is true, but it is also certainly the case that it is the defendants' obligation to demonstrate that they are being burdened, and they have not done so here, nor would it be appropriate, quite frankly, for them to do so here because we don't know what they are telling us is too burdensome to produce and how that is different than what we have requested.

I don't know what detailed document production about each spoofing episode means. Are they not going to produce the transaction records, their trading in Northwest Bio throughout the class period? I'm not sure how that possibly wouldn't be seen as relevant in this particular case. Are they not going to give us -- let's say there are messages at Citadel about how they want to engage in, you know, manipulative transactions on

January 5. But January 5, we didn't establish loss causation and somehow those e-mails would not be relevant to their scienter, more broadly with regard to the spoofing episodes that are currently in the case? I just don't see how that could be the case.

So it is hard for me to respond in the abstract about what they are saying they don't have to produce, what it would encompass, why it would be burdensome for them to produce.

So, for example, if we are talking about transaction records, certainly producing a single report that covers the four-year period is not particularly burdensome to produce when the alternative is they have to produce 94 separate reports on just those dates? If anything, I think the burden goes the opposite way.

If the issue is e-mails and communications about manipulative spoofing that occurred on specific dates, I don't see how that's more burdensome to exclude than to produce, particularly given their relevance to the other elements at issue in the case.

I do understand them to be suggesting that their trading algorithms they don't have to produce with regard to certain dates. If that's the case, I -- again, as your Honor indicated, I think those certainly would be relevant. But it is hard in the abstract to respond to what the scope of discovery should be without seeing what they are objecting to

producing, without understanding what their proposed burden is in producing it.

THE COURT: Well, look. I do agree with that point. I do think it is hard to issue a ruling in the abstract. But I do want to have some conversation here to see -- not that I intend to make a ruling here today, but that the two of you, when you discuss these issues, have a better sense of the parameters.

Now, I will get to you, Mr. Youngwood, in a moment.

I think you are raising some good specific questions. But, for example, you say it's not difficult for them to provide their transaction history in NWBO stock during the relevant time period. That may be true. But if all the spoofing episodes were still in the case, presumably you would want to see every baiting order, what you claim to be a baiting order, basically every buy and sell order that they placed, not just actual transactions.

Is that your position, that you want all those documents for all 2849 spoofing episodes?

MS. POSNER: As they apply to Northwest Bio, yes.

THE COURT: Well, of course as they apply to Northwest Bio.

MS. POSNER: Well, right, they are arguing that there are third-party transactions that might be at issue, so I just want to be clear that I don't -- for example, when I do a

securities case as a plaintiff and my client engaged in purchases and sales of the defendant corporation, I don't just produce those purchases and sales that occurred on the dates of the false and misleading statements, right? I have to produce all of my trading in the defendant corporation. I have to demonstrate that I have standing throughout those, that we can allege all of the elements with regard to those elements. I have to produce my policies and procedures that govern my trading in the given security. I have to do all communications with regard to the defendant corporation, whether they land on each false and misleading statement date or on each loss causation date in a typical 10(b)(5)(B) case.

So I don't understand the concept or why it would not be within the scope of Rule 34 for discovery pertaining to each of their transactions in Northwest Bio during the relevant period where your Honor has found that each of those transactions were manipulative acts with scienter, at least for purposes of pleading.

THE COURT: You are talking about the plaintiffs, the discovery you make on behalf of plaintiffs?

MS. POSNER: I was giving the reverse argument.

THE COURT: Yes, but --

MS. POSNER: Certainly it wouldn't be the case that I could argue, oh, I don't have to produce all of those relevant documents. They clearly are relevant to the litigation.

THE COURT: That's apples and oranges.

It's your contention they should produce each e-mail and message pertaining to any of the 28 —— 2,800 spoofing episodes?

MS. POSNER: Yes.

THE COURT: All right. So what if this was a more classic case of material misrepresentation, that kind of securities case, and you claim ten false statements and the Court on the motion to dismiss said, well, you've only shown loss causation as to two of them.

MS. POSNER: I would be entitled —— I have had that case many, many times, both in terms of a Court dismissing certain false and misleading statements or dismissing certain disclosures as not being sufficient for purposes of loss causation. I have never had a Court then limit our ability to get discovery with regard to the panoply of false and misleading statements and/or disclosure statements. And in fact that's typically the basis by which we would then later amend, if we had sufficient facts, to demonstrate further loss causation and/or falsity with regard to those statements that were dismissed.

Now if those statements were of an entirely different category, so let's say we allege that you lied about your revenue about an apple product and we also allege that you misstated your revenue with regard to a banana product, and the

Court said, nope, statements about banana products you haven't met your burden and that's an entirely different category of information, there might be an argument by the defendants of why they wouldn't have to search for those documents.

But that's not the case here. We are talking all about the apple products. Everything is about manipulative spoofing, which we allege occurred in the same manner across the board, and which your Honor has found manipulative acts and scienter for. They certainly go to pattern and practice. They certainly go to whether they put in place trading algorithms to engage in this process, which are all relevant to the 94,000 —— 9400 -- excuse me, 94 transactions that your Honor has sustained. So I don't think this is that scenario.

THE COURT: I should know myself, but when you say 94 transactions, that refers to the stock transactions that NWBO ——

MS. POSNER: It's actually -- it's actually dates. It's many more --

THE COURT: Dates, correct.

MS. POSNER: It's actually many, many more sales than that, but it's 94 dates.

THE COURT: But it also relates to hundreds of spoofing episodes, right?

MS. POSNER: Correct.

THE COURT: Not 2800, but hundreds.

MS. POSNER: Hundreds, correct. And hundreds of millions in sales.

THE COURT: Hundreds of millions of what in sales?

MS. POSNER: So it wasn't like they just sold one share on any of these dates. These are huge sales on the 94 dates.

THE COURT: Right. But your damages are whatever incremental difference there was in the price that NWBO procured in those sales versus what it would have procured absent the spoof.

MS. POSNER: Yes, the but-for price absent the spoofing, correct.

THE COURT: Okay.

All right, Mr. Youngwood, I will hear from you.

MR. YOUNGWOOD: I guess just a few points, your Honor, because I think your questions have captured much of what I was going to say.

There is no way this is a nine-figure case. There is no way this is an eight-figure case. It's almost certainly not a seven-figure case. I get that the extrapolation may not be precise, but I do think that counsel for plaintiffs, having had this Court's decision for some time, probably has a better sense of damages than we have discussed today. And our sense of damages, if they are right on absolutely everything, this is a very small case for there to be two screens of lawyers on it.

And, again, it's part of why we asked for the shorter discovery period. But as we go forward in discovery, we need to keep in mind what the size of the case is.

And I want to maybe respond to some of the examples counsel gave on a class action securities fraud case and why you might have discovery between alleged misstatements. You might have discovery between alleged misstatements because, at least under a plaintiff theory and under what courts have adopted, if the price is elevated and then you have an understatement, you still benefit, a plaintiff would argue, from the artificial inflation. So it's highly different from this type of case where we are talking about any damages here are going to be tied to exactly the allegations of spoofing on a day where all elements of the claim have survived the motion to dismiss.

So we are going to produce trading data for our client related to the days that have stayed in the case. But the converse——every day that there is any trading regarding this name for a three-, four-, five-year period, again, it's not before you to decide, but that's the case they pled. It's not the case that survived the motion.

Will there be some stuff, I'm sure, that's produced that isn't specifically tied to those days? Of course, I'm sure there will be, and we will do our best to work out with plaintiffs exactly what that is and avoid coming back to you.

But there needs to be a recognition that the case that was pled is not the case that we are litigating right now, and it is not the purpose of discovery to try to reimagine what one could have repled.

And finally, I think I am correct on this. What I will say is that, given the element that was found by you and affirmed by the district judge, to be missing on all days but a subset was loss causation, I don't know what would be in our records that would establish economic loss causation under the theory they have advanced, which is this economic theory that once you spoof once or twice or five times——I don't know what the threshold would be and, again, alleged, your Honor, because there was no spoofing here; I won't get into what the merits will show, but there was no spoofing——that somehow that contaminates the trading in the stock for all time? That's not going to be —— first of all, it's not proveable. But it's certainly not going to be proved by looking at defendants' internal e-mails and records. It is an economic theory and a pleading theory, not a "what were we talking about" theory.

So I don't even think if they were trying to unscramble the egg of the decisions here that narrow the case appropriately, they can look as hard as they want, they wouldn't find it in our documents.

THE COURT: Let me ask you —— thank you. Let me ask you a couple of specific questions.

Do you object to producing transactional data covering the entire relevant period showing your client's purchases and sales of NWBO stock?

MR. YOUNGWOOD: Your Honor, I don't think we have reached a final decision, but probably. I don't see what the relevance would be.

THE COURT: All right. But you --

MR. YOUNGWOOD: It's -- again, your Honor, it's not -- again, to take Ms. Posner's example where she represents an individual or an institutional investor who purports to represent a class--again, absent from this--and when they bought and sold is relevant for the whole time period that they allege, in a 10b-5 case, that the stock was artificially inflated. That's relevant, and they will want those purchases and sales as part of any damage calculation.

This is the opposite. The case has been narrowed to eliminate the days, other than the days that stayed in, and the theory that there is a continuous harm on a loss-causation basis has not been sustained after multiple complaints. There should be an effect on discovery of that.

THE COURT: As you know, I agree with you in general. But the question is in the specifics.

Do you disagree that the defendants should have to produce their trading algorithms for NWBO during the entire relevant period? I'm not sure how that gets limited, frankly.

You didn't –– you might have, but you didn't make a motion to shorten the time period and, of the transactions that survive, they scattered in different years. So it would seem to me, again, just off the top of my head, that -- and I think your letter indicated as much, the defendant –– the plaintiff would be entitled to see the relevant trading algorithms that may have played a role in the transactions that remain in the case.

MR. YOUNGWOOD: Your Honor, I think we have to parse that through as to what that means and if things changed over time. I think, frankly, your Honor, our plan––Citadel's plan, at least––is to produce data for the relevant dates quite promptly to let plaintiffs look at that and to engage in further conversation.

You know, we -- again, I know the schedule has been extended beyond what we suggested, but we are trying to front-load things as fast as we can and hopefully have constructive conversations. I have a hope, at least, that the plaintiffs, if they realize what's efficient to look at and what isn't in terms of their own time, we will get to a reasonable place.

But to your direct question, we will give what we need to give for the dates in question, and whether that applies to all dates over a, I think, 19 –– 2017 through 2022 period, I just -- I'm not sure anything will apply to all dates.

THE COURT: I mean, I don't know if the trading

algorithms change each day or how frequently they change, but certainly, if there was a trading algorithm that was guiding transactional activity during one of the days that everybody agrees is in play, it seems to me plaintiffs are entitled to that whether the algorithm was generated during that time period or two months or two years before.

MR. YOUNGWOOD: I hear you, your Honor, and let us see how best we can -- I hear you, and let us see how best we can parse it.

Again, I know we are not up to it. Part of the issue here is our own look at our own records is there was no spoofing. There are allegations here of spoofing and it survived the motion, so it's a little carrot and horse. Like, there is no algorithm that directed spoofing, so I can't produce the spoofing algorithm.

You are saying something more basic, the trading algorithm. I understand. I understand. I understand.

THE COURT: Obviously, your view that there was no spoofing doesn't mean that you can't produce the trading algorithms.

MR. YOUNGWOOD: I understand.

THE COURT: You ought to want to produce them because they will presumably, in your view, confirm your position that there was no spoofing.

Let me ask you something else.

E-mails. I assume a search term will be something like "spoofing" or "spoof" or maybe there is some other vocabulary used by traders that Ms. Posner knows about and will include in her list of search terms. It does seem to me that -- even assuming given the motion to dismiss ruling, it seems excessively burdensome to me, at least in terms of my instinct, that you should have to produce every e-mail relating to every spoofing episode.

If there is some e-mail between the relevant traders or instant message, what have you, that talks about spoofing in relation to a spoofing episode that is not in the case any longer, that seems to at least potentially be relevant.

And so would you agree that your ESI searches could cover the entire relevant period when it comes to issues like that?

MR. YOUNGWOOD: The short answer is yes, your Honor. I think that our ESI searches will not just be limited to the specific days. I do think there is going to have to be some proportionality because we are talking about a five-year period. And I think, even there, we are not necessarily going to be in agreement with plaintiffs. I think they seem to be wanting documents up to the present, 2025. I think we are going to have a big dispute if that's the case.

But I am not categorically ruling out looking at e-mails throughout the "whatever relevant period is" relevant

period, yes.

THE COURT: All right.

MR. YOUNGWOOD: Again, it's going to have to be an art a bit more than science to find search terms that don't, you know, create a disproportionate burden. But we are not going to simply say we won't look on certain days for all purposes. Right? It may be there is going to be tiered search terms and other things to try to focus in.

THE COURT: Okay. And things like policies and procedures, I think you said in your letter you agree that that really should not be an issue.

MR. YOUNGWOOD: That shouldn't -- I hope it's not an issue. Yes, we are not just going to give you the policy and procedure of this day. I don't know how we would do that.

THE COURT: Right.

And, again, it is also a reality that, even after the motion to dismiss, either the entire time period that's alleged or pretty close to the entire time period that is alleged is in play because, for example, there is nothing before me to suggest the first two or three years of the relevant period should be lopped off because there was relatively little spoofing and so forth, that --

MR. YOUNGWOOD: I agree, your Honor. The one nuance, and I don't know how this plays out even, I will be honest, for my own client, not every defendant was involved in every

alleged trade, so there may be different time periods relevant here. So, again, everyone else has been quiet but, for their protection, I don't know that everyone goes back to '17.

THE COURT: Okay. Fair enough.

All right. Well, let me ask both of you how we should proceed on this issue. I have given you some thoughts and perhaps some guidelines of how I am looking at it. Obviously, I will reiterate that that is after just looking at your (audio disruption) I haven't looked at any cases or anything like that. I don't think you really cite any cases that are particularly on point. I am not prepared to make a ruling now. What I would suggest is that you meet and confer on the issue and see if and to what extent you can reach agreement and then come back to me to the extent there is not agreement. That is kind of the most that I think we can accomplish today.

But I will hear from both of you.

And if you want to set a briefing schedule, that is something else I suppose we could accomplish.

MS. POSNER: I think that is appropriate. I think briefing something in the abstract is not particularly useful for the Court or for the parties. I think we actually need to know what the scope of the objections are and what the burden is——volume, cost, etc.——to have a useful brief to your Honor.

THE COURT: Well, you know, that is a good point. You have now propounded your document requests to all of the

defendants. I think you have said that, right, Ms. Posner?

MS. POSNER: Correct, correct.

THE COURT: Okay. So is the first step for the defendants to set forth their objections, in writing presumably, so that this dispute becomes more specific and less abstract and then the two of you can meet and confer with regard to the defendants' specific objections and then bring to me issues that remain?

MS. POSNER: I mean, that was what we thought would be most appropriate so that we actually know the contours of what we are arguing about and the specifics of how they might impact any given party.

THE COURT: Does that make sense, Mr. Youngwood.

MR. YOUNGWOOD: Yes. I mean, your Honor, we will be responding to the requests next week. I know they will be responding to our requests next week. I would hope we will spend a week or two talking to each other, and if it's clear we have disputes, we will come to you.

I mean, I will say, you know, often you produce stuff, the other side looks at it, and then they really see if they need more. But whatever -- I mean, perhaps, your Honor, it just makes sense for us to spend the next week or two talking, and then if we deal feel in the short term we need to come back to you, we come back to you in the short term; and if we can muddle along with each other for a month or two of producing

stuff, we come back to you later. Whatever you wish, your Honor.

THE COURT: I think that makes sense. I think it is premature to set a briefing schedule now. I think you first need to figure out what, if any, the specific disputes are.

Ms. Posner, you do have the benefit of my general 30,000 foot view of this. I do think the motion to dismiss ruling has consequences in terms of limiting the discovery. You think I have to take into account proportionality and the specific amount in controversy. You certainly haven't persuaded me, to be honest, with anything you have said today that makes me think this is a nine-figure or eight-figure case. You are going to have to say something more specific to persuade me about that.

MS. POSNER: I mean, I --

THE COURT: I just don't see the amount in controversy as being as large as you contend. And I have to, I'm required to take that into account in shaping the contours of discovery in this case.

MS. POSNER: Yes. I understand the difficulty that your Honor is in.

I would just note that there has been no briefing on this specific issue. At the motion to dismiss stage damages were not part of what was being discussed. How you measure damages in this case is very much an open question.

I will also point to Harrington, which has gone through summary judgment and expert reports and which also is a spoofing case where the amount in controversy is significantly larger than what the defendants are stating here. I think that --

THE COURT: But that –– I'm sorry to cut you off, but that –– in that case, the long-term price impact theory was left intact following the motion to dismiss so --

MS. POSNER: That is true, as it was in --

THE COURT: -- it's completely different.

MS. POSNER: As it was in Mullen, which I think is part of the controversy here in terms of how the cases proceed separately under different concepts of loss causation at this early stage and is part of the reason why I think allowing amendment would be fruitful here.

But putting that to the side, I think damages are different than loss causation. Right? Loss causation is demonstrating an immediate response to a disclosure in some capacity. That doesn't mean that there is not damages that flow that are longer than 24 hours from a given spoof. And we intend to prove that that is in fact the case.

THE COURT: Well, if you are saying you intend to prove, take an example, that the spoofing that occurred in and around the October 12, 2020, transaction continued to have effects on NWBO's stock price in 2022, I think I and

Judge Woods have pretty clearly rejected that.

Now, you may have some amendment down the road, some new evidence to get that back into the case, but at the moment, that is not in the case.

MS. POSNER: So, I understand your Honor's position. I think you specifically ruled with regard to loss causation, not damages, which I think are two different things. I think --

THE COURT: But the ruling, the ruling was that there was no causal relationship between, just to repeat my example, spoofing in 2020 and NWBO stock price in 2022.

MS. POSNER: Right. And I don't think that's exactly how the damages analysis would work in this particular circumstance. There is significant –– I'm trying to figure out how to say this without disclosing expert work.

There is significant literature and work with regard to the price impact of spoofing, particularly when you have spoofing at the volume and the breadth of time at which we have here and whether there is a price –– long-term price impact from a damages perspective is different than what your Honor ruled in with regard to loss causation. They are different elements. They require different things to demonstrate. And certainly damages are subject to expert analysis, which we have not had the benefit of sharing with your Honor at the pleading stage. So to be kind of forced prediscovery, pre-expert

analysis to prove to your Honor how we will demonstrate damages and what they are, I am a bit at a disadvantage without providing kind of that expert analysis and the support for it.

THE COURT: Well, look --

MS. POSNER: Which also is going to be dependent upon discovery to a large extent. We feel very confident, based on our understanding of this market, that there are also additional dates of spoofing episodes that are not currently encompassed within the complaint as well and certainly have not been able to demonstrate to your Honor thus far, like they were able to do in Mullen and Harrington that, at least for pleading purposes, that there is more than a 24-hour impact from spoofing. But certainly we think we are entitled to make those arguments to your Honor and that we are entitled to provide expert analysis demonstrating that. Obviously your Honor will rule on that and decide whether you think it is sufficient under *Daubert* standards whether the defendants have -- the expert has the better argument or our expert has the better argument. But certainly at the pleading stage I think that is far too premature to be ruling on.

THE COURT: Well, the ruling is the ruling. You may well be right that there is some expert testimony out there and other circumstances that suggest there is merit to your long-term price impact theory, which is basically what you are

arguing now. But I and Judge Woods ruled that you haven't sufficiently pled it. And if you haven't sufficiently pled it, under the PSLRA and general principles, it is not part of the case. That's the way the PSLRA works. You have to adequately plead something before the defendants are burdened with discovery. And it sounds to me like you are putting the cart before the horse or the horse before the cart or something --

MS. POSNER: I think --

THE COURT: -- and I think you need to grapple with that or persuade me how if –– why I should, consistent with the PSLRA in particular, allow you discovery on the theory, based on the motion to dismiss practice, the Court has determined you haven't plausibly pled in the first instance.

MS. POSNER: So the discovery that we are discussing here, to the extent it is specific enough, is discovery that goes to the elements you have held that we sufficiently pled so --

THE COURT: But --

MS. POSNER: -- I ––

THE COURT: But unless it has a bearing on the subsequent transactions, and it can, we talked about an example of an e-mail from --

MS. POSNER: Right.

THE COURT: –– some spoofing episode that is not part

of the case now, but it shows an intent to spoof and if it is the same people involved, that may well be evidence of spoofing as to a later transaction that is in the case, even though there is no e-mail from those same traders that talks about spoofing. I get that. But all of the trading data and all of the e-mails relating to each and every spoofing episode, I am just not seeing how that is proportionate.

MS. POSNER: I guess my argument would be that an e-mail from a date that is currently not in the case evidencing intent to spoof is the equivalent, when you are talking about high-speed trading algorithms, of the manner in which you are engaging in transactions on other dates as well. I don't see them as being distinct in their impact on scienter or whether there were manipulative acts by the defendants.

And certainly information that bears on scienter, for example, can take place well after the facts in question. So typically in a 10(b)(5) case, for example, evidence of knowledge post the disclosures of the fraud would be relevant to knowledge and scienter with regard to the falsity earlier in the class period, and that is typically not an issue in securities cases either. And given the breadth of the rule, I don't see how we can be barred from having their transaction records in Northwest Bio's securities, nor do I understand the burden in producing it, quite frankly, given that it is relevant to those other elements of the case.

Now, if we were specifically asking, for example, for something specific as to loss causation on a date that has been excluded from the case, then I could understand the argument at least. But evidence that goes to scienter or manipulative acts during the course of the relevant period that shows pattern and practice, for example? I just don't see how it can be distinct.

But, again, I think this is a premature discussion to be having because I really don't understand the contours of what the defendants are arguing they do or do not have to produce here.

I will also note that Citadel requested from the plaintiff information, first of all, well beyond the scope of this case, but with regard to all of its sales during the relevant period. And so if the defendants believe only information pertaining to the transactions that are at issue in the case, then I guess the converse would be true, that they should only be entitled to information with regard to the sales that took place within 24 hours of a defendant's spoof.

So I don't even think that they believe that the information should be so limited from a practical standpoint. I think they understand the implications of it for the case, but want to avoid having to produce documents here. And the judges in both Harrington and Mullen, I think, similarly, agree, and the only other spoofing cases that we have from a

private perspective that are out there.

THE COURT: All right. Okay. So what would you like to discuss in terms of settlement? Anything?

MR. YOUNGWOOD: Your Honor, I think it is a bit premature to do that.

THE COURT: Okay. Yes. I saw that in the CMP. I am sure that it is. I just want to underscore that if the time comes and if you would like the assistance of the Court in hosting a settlement conference, by all means, reach out to me and we will set that up. I realize in cases of this nature there are other resources and private mediators who are often used, but I do understand that it is premature at this point.

All right. Can I ask that the CMP be resubmitted to reflect the agreement on the dates that we reached here today. I don't know if you want to submit something that removes the written colloquy reflecting your different positions on issues and just have something that is more plain vanilla and has the dates. That may be better, but I will leave that up to you.

MS. POSNER: We can do that, your Honor.

MR. YOUNGWOOD: Of course.

THE COURT: And then we will get that on the docket.

And June 16, I think, is the date we discussed by which you will let me know whether you do or don't have agreement with respect to the ESI protocol and the protective order.

I would normally set this down for another status today, but I think, in light of those issues, why don't we see how those play out first before scheduling another status conference at this point. Okay?

MR. YOUNGWOOD: Thank you, your Honor.

MS. POSNER: Thank you, your Honor.

MR. YOUNGWOOD: Have a good afternoon.

THE COURT: Okay.

MS. POSNER: Bye.

THE COURT: Have a good afternoon. Thank you all.

(Adjourned)

C E R T I F I C A T E

I, Kristen J. Carannante, certify that the transcript of the digital audio recording of the proceedings in the above-entitled matter is a true and accurate transcription.

Signature /s/ *Kristen J. Carannante*
KRISTEN J. CARANNANTE, RPR, RMR, FCRR
(848) 459-3124
kjcarannante@gmail.com

Date: June 6, 2025